**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRIENDS OF THE SANTA CLARA
RIVER; SANTA CLARITA
ORGANIZATION FOR PLANNING THE
ENVIRONMENT,
*Plaintiffs-Appellants*,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS; KIMBERLY COLLOTON,
in her official capacity as
Commander and District Engineer of
the Los Angeles District of the U.S.
Army Corps of Engineers,
*Defendants-Appellees*,

and

THE NEWHALL LAND AND FARMING
COMPANY, a California limited
partnership,
*Intervenor-Defendant-Appellee.*

No. 15-56337

D.C. No.
2:14-cv-01667-
PSG-CW

OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted February 10, 2017
Submission Vacated June 23, 2017
Resubmitted April 2, 2018
Pasadena, California

Filed April 9, 2018

Before:  Andrew J. Kleinfeld, Sandra S. Ikuta,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Ikuta

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's summary judgment in favor of the U.S. Army Corps of Engineers and intervenor Newhall Land and Farming in an action challenging the Corps' issuance of a permit, pursuant to Section 404 of the Clean Water Act, to Newhall Land, authorizing the discharge of materials into the Santa Clara River as part of the Newhall Ranch project in Los Angeles County near Santa Clarita, California.

After this case was argued on appeal, the Corps and Newhall Land settled with four of the six plaintiffs, and stipulated to their voluntary dismissal. The Corps acknowledged that the remaining plaintiffs, Santa Clarita

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Organization for Planning the Environment and Friends of the Santa Clara River, had standing to pursue their Clean Water Act claim. The panel held that the plaintiffs also had standing for their National Environmental Policy Act ("NEPA") and Endangered Species Act ("ESA") claims.

The panel rejected challenges under the Clean Water Act to the Corp's permit issuance. The panel concluded that the Corps complied with its obligations under the Clean Water Act because the Corps properly considered practicability as required under the Section 404(b) Guidelines.

The panel further concluded that the Corps complied with the ESA because its determination that Southern California steelhead would not be affected by the Project, and its corresponding decision not to consult with the National Marine Fisheries Service, were not arbitrary and capricious.

For similar reasons, the panel concluded that the Corps reasonably assessed the Project's potential impacts to the steelhead and provided sufficient discussion to satisfy its NEPA obligations.

## COUNSEL

John Buse (argued) and Aruna Prabhala, Center for Biological Diversity, Oakland, California; Dean Wallraff, Advocates for the Environment, Shadow Hills, California; for Plaintiffs-Appellants.

Anna Katselas (argued), Lesley Lawrence-Hammer, Norman L. Rave, Devon Lehman McCune, Jennifer Scheller Neumann, and Andrew C. Mergen, Attorneys; Eric Grant,

Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees.

James F. Rusk (argued) and Robert J. Uram, Sheppard Mullin Richter & Hampton LLP, San Francisco, California; David P. Hubbard v. Mark J. Dillon, Gatzke Dillon & Ballance LLP, Carlsbad, California; Miriam A. Vogel, Morrison and Foerster LLP, Los Angeles, California; for Intervenor-Defendant-Appellee.

## OPINION

IKUTA, Circuit Judge:

Under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, the U.S. Army Corps of Engineers (Corps) may issue permits authorizing the discharge of dredged or fill material into the navigable waters of the United States. In this case, we consider challenges to the Corps's issuance of a Section 404 permit to Newhall Land and Farming (Newhall Land), authorizing the discharge of materials into the Santa Clara River as part of the Newhall Ranch project in northwestern Los Angeles County near Santa Clarita, California.

The Santa Clarita Organization for Planning the Environment (SCOPE) and the Friends of the Santa Clara River (Friends)[1] challenge the permit issuance under the

---

[1] We refer to the organizations collectively as "SCOPE" where appropriate, or otherwise refer to them by their respective names. After oral argument, four other plaintiffs in this litigation, the Center for

Clean Water Act (CWA), the National Environmental Policy Act (NEPA), and the Endangered Species Act (ESA).[2] We conclude that the Corps complied with the numerous requirements prescribed by each of these statutes, and we affirm.

I

We begin by reviewing the legal framework.

A

Under the CWA, the discharge of any pollutant (including dredged or fill material) to navigable waters is unlawful unless the discharge complies with various statutory requirements, including obtaining a permit issued by the Corps under Section 404 of the CWA, 33 U.S.C. § 1344 (a Section 404 Permit). 33 U.S.C. §§ 1311(a), 1362(6), (12); *see also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 123 (1985). Section 404 of the CWA authorizes the Corps to "issue permits, after notice and opportunity for public hearings[,] for the discharge of

Biological Diversity, the Wishtoyo Foundation, Ventura Coastkeeper, and the Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation (the Santa Ynez Band) reached a settlement with the Corps and Newhall Land and were voluntarily dismissed from the case.

[2] The Santa Ynez Band also advanced a challenge under the National Historic Preservation Act (NHPA). Because neither of the remaining plaintiffs has standing to pursue the NHPA claim, we **GRANT** the Corps and Newhall Land's unopposed motion to dismiss the NHPA claim. We also **GRANT** their unopposed motion for a limited remand to the district court to seek partial vacatur of the NHPA portion of its decision as part of the settlement agreement.

dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a); *see also* 33 C.F.R. § 325.2 (processing of applications). The term "navigable waters" means "the waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7), which is further defined by regulation to include wetlands, 33 C.F.R. § 328.3(a)(3) (2014).[3]

When an applicant applies for a permit for a discharge to wetlands, the Corps evaluates whether to grant or deny the application under guidelines developed by the Environmental Protection Agency (EPA) in conjunction with the Secretary of the Army and published in 40 C.F.R. part 230. *See* 33 C.F.R. § 320.2(f); *see also* 33 U.S.C. § 1344(b). These regulations, referred to as the Section 404(b)(1) Guidelines, or simply the Guidelines, provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as

---

[3] The 2015 regulations setting forth a new definition of "waters of the United States" had been stayed by the U.S. Court of Appeals for the Sixth Circuit. *In re EPA and Dep't of Def. Final Rule*, 803 F.3d 804, 809 (6th Cir. 2015). On January 22, 2018, the Supreme Court held that the courts of appeals do not have original jurisdiction to review challenges to the 2015 Rule. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 623 (2018). Pursuant to an Executive Order, the Environmental Protection Agency, Department of Army, and the Corps published a final rule delaying the applicability of the 2015 regulations until February 6, 2020. Definition of "Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule, 83 Fed. Reg. 5200 (Feb. 6, 2018). Until that applicability date, "the agencies will administer the regulations in place prior to the 2015 Rule, and will continue to interpret the statutory term 'waters of the United States' to mean the waters covered by those regulations." *Id.* at 5201. We therefore rely on the definition set forth in the prior regulations.

the alternative does not have other significant adverse environmental consequences" except as otherwise specified. 40 C.F.R. § 230.10(a).  That is, the Corps must analyze alternatives to the proposed discharge and "select the least environmentally damaging practicable alternative." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 955 (9th Cir. 2008).

The Guidelines further provide that "[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).  The term "practicable alternatives" includes "[a]ctivities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters" and "[d]ischarges of dredged or fill material at other locations in waters of the United States or ocean waters." 40 C.F.R. § 230.10(a)(1).

In order to determine whether an alternative is practicable, "the Corps must first determine the 'overall project purpose.'" *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 1002 (9th Cir. 2013) (quoting 40 C.F.R. § 230.10(a)(2)).  In defining the overall project purpose, "the Corps has a duty to consider the applicant's purpose," *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989), and "the objectives of the applicant's project," *id.* (quoting *La. Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985) (per curiam)).  "Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." *Id.* (quoting *La. Wildlife Fed'n*, 761 F.2d at 1048).  The permit applicant may not define the project purpose narrowly "in order to preclude the existence

of any alternative sites and thus make what is practicable appear impracticable." *Id.* But when the applicant's stated purpose is "genuine and legitimate," the Corps may not reject it. *Id.*

In determining the overall project purpose, the Corps will "normally accept decisions" by state, local, and tribal governments with respect to "zoning and land use matters," unless "there are significant issues of overriding national importance." 33 C.F.R. § 320.4(j)(2). Likewise, when the Corps approves or undertakes projects requiring the discharge of material into the waters of the United States, it must consider "officially adopted state, regional, or local land use classifications, determinations, or policies." 33 C.F.R. § 336.1(c)(11)(ii).

In analyzing "practicable alternatives," the Corps must determine whether a project is "water dependent." A project that "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose" is "not 'water dependent.'" 40 C.F.R. § 230.10(a)(3). A project's "basic purpose (for determining water dependency) is distinct from the overall purpose (for determining practicable alternatives)." *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 157 (3d Cir. 2017) (emphasis omitted). When a project's basic purpose is not water dependent, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). "[C]lassification of an activity as 'non-water dependent' does not serve as an automatic bar to issuance of a permit . . . [it] simply necessitates a more persuasive showing than otherwise concerning the lack of alternatives." *Sylvester*, 882 F.2d at 409 (quoting *La. Wildlife Fed'n, Inc. v. York*,

603 F. Supp. 518, 527 (W.D. La. 1984), *aff'd in part and vacated in part*, 761 F.2d 1044 (5th Cir. 1985)) (alterations in original). When the Corps recognizes that a project is not water dependent, considers a range of alternative sites for the project, and concludes that there are no practicable alternative sites available, the presumption is rebutted. *Bering Strait Citizens*, 524 F.3d at 947; *see also Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010) (holding that "the Corps applied the proper presumption and found that it had been rebutted" because "the Corps acknowledged that the proposed project was not water dependent" and reviewed "over a dozen alternative sites"). We then defer to the Corps's approval of an alternative. *Bering Strait Citizens*, 524 F.3d at 947.

B

Before issuing a permit allowing the discharge of dredge or fill materials into wetlands, the Corps must comply with NEPA, 42 U.S.C. §§ 4321–4370m-12; *see* 33 C.F.R. § 325.2(a)(4) and Appendix B. NEPA requires all federal agencies to consider the environmental impact of any "major Federal actions significantly affecting the quality of the human environment," and provide a detailed statement on "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and any "alternatives to the proposed action." 42 U.S.C. § 4332(C).

The Corps's procedures for implementing NEPA include directions for preparing an environmental impact statement (EIS) for a decision on a permit application. *See* 33 C.F.R. §§ 230.13, 325.2(a)(4). If the Corps is the lead agency, 33 C.F.R. § 230.16(a); 40 C.F.R. § 1501.5, it must address the

purpose and need of the project and consider reasonable alternatives, among other requirements. 33 C.F.R. § 325 app. B (9)(b)(4), (5).    Because "NEPA does not provide substantive protections, only procedural ones," *Conservation Cong. v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014), "our review is limited to whether the EIS contains 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences,'" *Nat. Res. Def. Council v. U.S. Dep't of Transp.*, 770 F.3d 1260, 1271 (9th Cir. 2014) (quoting *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997)).  Although a court must "insure that the agency has taken a hard look at environmental consequences," a court cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (quoting *Nat. Res. Def. Council v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972)) (internal quotation marks omitted).

C

The Corps must also comply with the ESA, 16 U.S.C. §§ 1531–44.  Under the ESA, each federal agency must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat" of endangered or threatened species.  16 U.S.C. § 1536(a)(2). Therefore, the Corps must review the permit application "for the potential impact on threatened or endangered species pursuant to section 7 of the Endangered Species Act." 33 C.F.R. § 325.2(b)(5).  If the Corps determines that "the proposed activity may affect an endangered or threatened species or their critical habitat," it must "initiate formal

consultation procedures with the U.S. Fish and Wildlife Service [(FWS)] or National Marine Fisheries Service" (NMFS). *Id.*[4] Conversely, if the Corps "determines that the proposed activity would not affect listed species or their critical habitat, [it] will include a statement to this effect" in the public notice regarding the application for a permit, *id.*, and "the consultation requirements are not triggered," *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994).

After the Corps has completed its review, it will determine whether a permit should be issued and (if an EIS has been prepared) issue a record of decision (ROD). 33 C.F.R. § 325.2(a)(6).

## II

We next turn to the lengthy history of the Newhall Ranch Project and the activities preceding the Corps's issuance of the Section 404 Permit.

Starting in the early 1990s, Newhall Land, a land management company, and Los Angeles County (the County) began developing a land use plan (the Newhall Ranch Specific Plan) to guide the development of the Newhall

---

[4] FWS and NMFS apportion listing and consultation responsibilities by species. *See* 50 C.F.R. § 402.01(b). FWS is responsible for land-based and freshwater species, and NMFS is responsible for marine and anadromous species. *See Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1051 (9th Cir. 2013); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1063 n.1 (9th Cir. 2004), *superseded on other grounds by* Definition of Destruction or Adverse Modification of Critical Habitat, 81 Fed. Reg. 7214 (Feb. 11, 2016) (codified at 50 C.F.R. § 402.02 (2016)).

Ranch Project.  As envisioned in the Specific Plan, the Project would be a large-scale residential, commercial, and industrial development in northwestern Los Angeles County near the city of Santa Clarita.  It would encompass approximately 12,000 acres, including 5.5 linear miles of the Santa Clara River and its tributaries.  In compliance with the California Environmental Quality Act (CEQA), Cal. Pub. Res. Code §§ 21000–21189.57,[5] the County held public hearings and published an environmental impact report (EIR) for the Specific Plan.  The County ultimately approved the Specific Plan, as revised in response to public comments, and issued various project approvals, including zoning changes.

Environmental groups immediately brought actions in state court to challenge the County's approval of the Specific Plan.  In August 2000, the state court ordered the County to vacate the project approval and conduct further environmental analyses.  *See Ctr. for Biological Diversity v. Dep't of Fish & Wildlife*, 224 Cal. App. 4th 1105, 1112 (2014), *rev'd on other grounds*, 62 Cal. 4th 204 (2015). Following numerous additional hearings and further analyses, the County adopted a revised Specific Plan for the Newhall Ranch Project in May 2003.  As revised, the Specific Plan provided for the development of more than 21,000 residential units and 5.5 million square feet of commercial, office, and

---

[5] CEQA is similar to NEPA, and requires the preparation of an "environmental impact report" (EIR) by the lead state agency.  *See* Cal. Pub. Res. Code § 21100; *see also City of Los Angeles v. FAA*, 138 F.3d 806, 807 (9th Cir. 1998).  While both NEPA and CEQA impose procedural requirements, *see City of Carmel-By-The-Sea*, 123 F.3d at 1150, CEQA also contains a "substantive mandate that public agencies refrain from approving projects for which there are feasible alternatives or mitigation measures," *Mountain Lion Found. v. Fish & Game Comm'n*, 16 Cal. 4th 105, 134 (1997).

retail uses in a series of "interrelated villages." *Id.* at 1113. The state court approved the amended Specific Plan, and dismissed the environmental plaintiffs pursuant to a settlement agreement. *Id.*

In December 2003, Newhall Land applied to the Corps for a Section 404 Permit that would allow the construction of the infrastructure necessary for the development authorized by the Specific Plan. Pursuant to its permitting regulations, the Corps determined it was the lead agency for purposes of NEPA compliance. *See* 33 C.F.R. § 325.2(a)(4), app. B § 325(8). After deciding to prepare an EIS, the Corps coordinated with the California Department of Fish and Wildlife (CDFW) to prepare a combined EIS/EIR.

The Corps published a notice of intent to prepare an EIS/EIR in the Federal Register in 2004 and a second one in 2005, and held two public scoping meetings to determine the scope of the issues to be addressed and to identify the significant issues relating to the action. *See* 40 C.F.R. § 1501.7. The Corps circulated the Draft EIS/EIR in May 2009 for public comment. After receiving and considering public comments on the Draft EIS/EIR, the Corps prepared a Final EIS/EIR, which included the Corps's Draft Section 404(b)(1) Guidelines Evaluation.

As part of its analysis of the Project's water quality, biological resources, and cumulative impacts, the Final EIS/EIR discussed the Project's water discharges into the Santa Clara River and the potential impacts on the Southern California steelhead, an endangered species. The Corps determined that the Project area was not part of the steelhead's critical habitat, but considered the Project's potential to affect steelhead and its habitat downstream of the

Project area through increased stormwater discharges. While the Santa Clara River generally contains water on a year-round basis, a portion of the river between the Project area and the downstream steelhead areas is dry most of the year, so Project discharges would generally not impact steelhead. (This dry reach of the river is informally known as the "Dry Gap.")  In months when there is sufficient rainfall, however, stormwater runoff may flow through the Dry Gap, and during those periods Project discharge might reach steelhead populations.  The Corps nonetheless determined that these changes would not have a substantial adverse effect on the southern steelhead.

In reaching this conclusion, the Corps analyzed the combination of wastewater and stormwater discharges from the Project, and concluded that the Project's total discharges would have a dissolved-copper concentration of 9.0 micrograms-per-liter.  This concentration is less than the existing dissolved-copper concentration in the Santa Clara River that occurs during storm events large enough to flow through the Dry Gap.  In addition, this concentration would be less than the limit of 32 micrograms-per-liter of dissolved copper that the California Toxics Rule (CTR), an EPA-promulgated regulation establishing water quality standards in California, set for the Santa Clara River.[6]  Accordingly, the Corps concluded in the Final EIS/EIR that the Project would

---

[6] The CTR "promulgates criteria for priority toxic pollutants in the State of California for inland surface waters and enclosed bays and estuaries," including for aquatic life, 40 C.F.R. § 131.38(a), and is "legally applicable in the State of California for inland surface waters, enclosed bays and estuaries for all purposes and programs under the Clean Water Act."  Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California, 65 Fed. Reg. 31,682, 31,682 (May 18, 2000) (codified at 40 C.F.R. pt. 131).

not affect the steelhead, and therefore it was not required to consult with NMFS to discharge its responsibilities under the ESA. *See* 16 U.S.C. § 1536(a)(3); 33 C.F.R. § 325.2(b)(5).

The Corps solicited additional comments that would be considered "before the Corps . . . finalizes the Record of Decision (ROD) for the Federal action associated with the proposed project." Among other letters, it received a comment letter from Ventura Coastkeeper expressing its concern that the Project's discharges would contain dissolved copper at a concentration that would harm Southern California steelhead. In August 2010, the Corps also received a letter from the EPA, offering comments on the Final EIS/EIR and suggesting, among other things, that the Corps's practicability analysis for different alternatives should consider the expected revenues from the Project. The EPA subsequently sent a letter in August 2011, indicating that it would not seek review of the Corps's permit decision, citing significant improvements to the Project design and additional mitigation measures that had resulted from collaboration among the EPA, the Corps, and Newhall Land.

On August 31, 2011, the Corps issued a ROD and a provisional Section 404(b) permit to Newhall Land. The ROD addressed the comments the Corps had received on the Final EIS/EIR. In responding to Ventura Coastkeeper's comment letter, the Corps summarized the results of a Supplemental Water Quality Analysis conducted by a third-party consultant in May 2011, which showed that the additional stormwater retention measures incorporated into the Project would further reduce the dissolved-copper concentration in the Project's stormwater discharges.

The Corps also appended its Final Section 404(b)(1) Guidelines Evaluation (Final Evaluation) to the ROD. The Final Evaluation stated that it was not a stand-alone document, but relied heavily on the information provided in the Draft EIS/EIR and the Final EIS/EIR. Like the Final EIS/EIR, the Final Evaluation concluded that the Project would not affect the steelhead and therefore consultation with NMFS pursuant to the ESA was not required.

The Final Evaluation defined the "overall project purpose" for purposes of analyzing the practicability of alternatives as follows:

> [T]he development of a master planned community with interrelated villages in the vicinity of the Santa Clarita Valley in northwestern Los Angeles County that achieves the basic objectives of the Specific Plan by providing a broad range of land uses of approximately the same size and proportions as approved in the Specific Plan, including residential, mixed-use, commercial and industrial uses, public services (schools, parks, etc.), and a water reclamation plant.

The Corps determined that the overall project purpose also included 15 of the 37 basic objectives of the Specific Plan. The Corps stated that the "basic project purpose," which is used to determine whether the project is water dependent, was "to provide housing and commercial/industrial/mixed-use development." Because the basic project purpose was not water dependent, the Corps determined that the rebuttable presumption that practicable alternatives were available applied, but was rebutted because the Corps had analyzed

23 alternative sites and concluded that they were impracticable.

The Final Evaluation considered the eight on-site alternatives described and analyzed in the Final EIS/EIR, in order to determine which one was the "least environmentally damaging practicable alternative." *Bering Strait Citizens*, 524 F.3d at 955. These alternatives included a no-build alternative (Alternative 1), Newhall Land's preferred alternative (Alternative 2), and six other alternatives (Alternatives 3 through 7 and Modified Alternative 3), each with varying project sizes and resulting impacts on waters of the United States. Alternative 2, Newhall Land's alternative, proposed developing 2,864.2 acres, which would include 20,885 residential units[7] and 5.5 million square feet of commercial space. It would have permanently filled 93.3 acres of waters of the United States, including 20.5 acres of wetlands, and would have temporarily filled 33.3 acres of waters of the United States, including 11.2 acres of wetlands.

The Corps selected Modified Alternative 3 as the least environmentally damaging practicable alternative. Compared to Newhall Land's preferred alternative (Alternative 2), Modified Alternative 3 reduced permanent impacts to waters of the United States by 29 percent and temporary impacts by 3 percent. It also reduced the acreage that could be developed for residential units by 10 percent and likewise reduced the

---

[7] The Specific Plan allowed an additional 423 residential "second units" as part of the Project, *see Ctr. for Biological Diversity*, 224 Cal. App. 4th at 1113, but the Corps did not consider those units separately in its analysis because the Corps determined that they would not impact the Project's development footprint or secondary environmental effects. SCOPE does not challenge this decision.

developable commercial acreage by 14 percent, increasing the Project's cost per developable acre by 5.7 percent. The Corps concluded that further modifications to the Project would be impracticably expensive, noting that Modified Alternative 3 would be more costly than the most expensive comparable development project in the region. Accordingly, the ROD adopted Modified Alternative 3 as the basis for the Section 404 permit.

In March 2014, SCOPE sued the EPA, the Corps, and their respective agency officials in district court, alleging violations of the CWA, NEPA, and the NHPA.[8] Newhall Land successfully moved to intervene as a defendant. In January 2015, SCOPE amended its complaint to assert an additional claim under the ESA. On cross-motions for summary judgment, the district court granted summary judgment in favor of the Corps and Newhall Land on June 30, 2015, the judgment that SCOPE now appeals.

III

Before reaching the merits of SCOPE's claims, we consider whether the plaintiffs have standing to bring their NEPA and ESA claims. After this case was argued on appeal, the Corps and Newhall Land settled with four of the six plaintiffs, and stipulated to voluntary dismissal of those plaintiffs. In supplemental briefing on the effect of these dismissals, the Corps and Newhall Land argue that while both of the remaining plaintiffs, SCOPE and Friends, have

---

[8] The district court dismissed the EPA and its officials as defendants for lack of subject matter jurisdiction. The propriety of this dismissal is not before us on appeal. As explained above, *supra* 5 n.2, we grant the Corps and Newhall Land's unopposed motion to dismiss the NHPA claim.

standing to pursue their CWA claim, they lack standing to pursue their NEPA and ESA claims.  We may consider the jurisdictional question of Article III standing for the first time on appeal.  *See Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).  Because "[t]he need to satisfy [Article III standing] requirements persists throughout the life of the lawsuit," if circumstances change such that the plaintiffs before us no longer possess standing, we must dismiss the affected claims.  *Wittman  v. Personhuballah*, 136 S. Ct. 1732, 1736–37 (2016).  We conclude, however, that SCOPE and Friends possess standing for their NEPA and ESA claims.

A

"[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).  When there are multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."  *Id.* at 1651.  In order for an organizational plaintiff such as SCOPE or Friends to have standing, it must demonstrate that at least one of its "members would otherwise have standing to sue in [the member's] own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Wash. Envtl. Council*, 732 F.3d at 1139 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

A plaintiff seeking relief in federal court must establish the three elements that constitute the "irreducible

constitutional minimum" of Article III standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), namely, that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

This standard "is softened when a plaintiff asserts a violation of a procedural right" conferred by a federal statute, *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017) (internal quotation marks and citation omitted), because "the causation and redressability requirements [for standing] are relaxed," *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (citation omitted). In order to establish an injury in fact in the context of a claimed procedural error in an agency's decisionmaking process, a plaintiff must show that "(1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." *Haugrud*, 848 F.3d at 1232 (alterations in original) (quoting *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 949 (9th Cir. 2006)).

To establish causation and redressability, the plaintiff must show that "the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision." *WildEarth Guardians*, 795 F.3d at 1156 (quoting *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008)). In the NEPA context, plaintiffs may demonstrate redressability with a showing that the agency's decision could "could be influenced by the

environmental considerations that NEPA requires an agency to study." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003). A plaintiff does not need to show that the correction of the alleged procedural error would lead to a decision more favorable to plaintiffs' interests. *See id.* ("In order to establish redressability, plaintiffs asserting the inadequacy of an agency's EIS . . . need not show that further analysis by the government would result in a different conclusion."); *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001) ("[P]laintiffs asserting procedural standing need not demonstrate that the ultimate outcome following proper procedures will benefit them."). Similarly, plaintiffs asserting violations of the ESA's consultation requirements are "not required to establish what a Section 7 consultation would reveal, or what standards would be set." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1082 (9th Cir. 2015).

While "[t]his is not a high bar to meet . . . . the redress[a]bility requirement is not toothless in procedural injury cases." *Salmon Spawning*, 545 F.3d at 1227. Procedural rights "can loosen . . . the redressability prong," not eliminate it. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). For instance, we have found redressability lacking where an agency's correction of a procedural error could not lead to a decision more favorable to plaintiffs, as where a project had already been completed, *see Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1102–03 (9th Cir. 2007), where a different agency had already made the same decision, *see Nuclear Info. & Res. Serv.*, 457 F.3d at 955, or where the agency could not reverse the United States' entrance into an international treaty, *see Salmon Spawning*, 545 F.3d at 1227.

In this case, SCOPE and Friends assert procedural violations of NEPA and ESA. *See WildEarth Guardians*, 795 F.3d at 1154 (noting that a claim "alleging a NEPA violation" is procedural); *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc) ("[A]lleged violations of Section 7(a)(2)'s consultation requirement constitute a procedural injury for standing purposes.").

B

Newhall Land argues that the plaintiffs have failed to show standing even under our relaxed standards. According to Newhall Land, the plaintiffs have not shown that the Corps's alleged procedural deficiencies under NEPA and ESA affected their concrete interests, because plaintiffs allege only that the Corps conducted an inadequate analysis of the Project's impacts on Southern California steelhead under NEPA, and that the Corps failed to engage in consultation with the NMFS regarding those impacts as required under the ESA.[9]  But, Newhall Land argues, the plaintiffs' interests are limited to recreation and natural resources *within* the Project area, where steelhead are not present.

This argument fails, however, because under our relaxed standard, the plaintiffs need show only that "the challenged [agency] *action* will threaten their concrete interests," *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011) (emphasis added), not that the alleged procedural deficiency will threaten such interests.  Here the challenged agency action is the Corps's issuance of the Section 404 permit, and

---

[9] Before the district court, SCOPE also challenged the Final EIS/EIR's traffic and cultural resource analysis, but does not do so on appeal.

so the plaintiffs need show only that the issuance of the permit will affect their interest in recreation and aesthetics in the Project area; they do not need to show that the alleged inadequacies in the Corps's analysis of the Project's impact on steelhead will have such an effect. *See, e.g., id.* at 1172; *Nuclear Info. & Res. Serv.*, 457 F.3d at 952; *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004). Two other circuits have likewise rejected Newhall Land's argument that the plaintiffs' injury must be tied to the particular procedural deficiency alleged. *See WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1231 (10th Cir. 2017); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 307 (D.C. Cir. 2013) ("The Appellants' aesthetic injury follows from an inadequate FEIS whether or not the inadequacy concerns the same environmental issue that causes their injury."). SCOPE and Friends have concrete interests at stake, *see Laidlaw*, 528 U.S. at 183, and it is reasonably probable that those interests will be threatened by the "challenged action," *Ctr. for Food Safety*, 636 F.3d at 1171, the issuance of the Section 404 permit.

We also reject the argument that plaintiffs failed to show causation and redressability. Contrary to Newhall Land's argument, SCOPE and Friends do not need to show that the Corps's correction of the alleged procedural error would lead to a favorable decision such as a decision not to issue a Section 404 permit. *See Laub*, 342 F.3d at 1087. Rather, plaintiffs need only show a reasonable probability that the Corps' decision "could be influenced by the environmental considerations that NEPA requires an agency to study." *Id.*

Here, such a reasonable probability exists. Plaintiffs suggest that if the Corps conducted further analysis, it would become aware of more significant impacts to steelhead.

Because the Project's stormwater discharge results from paving over surfaces that would otherwise absorb rainfall, it is plausible that mitigating those impacts would result in alterations or reductions to the Project's footprint. Moreover, if the analysis revealed that the Project would "affect" steelhead, 50 C.F.R. § 402.14(a), the Corps would then have to engage in ESA consultation, possibly leading to further Project modifications. *See* 16 U.S.C. § 1536(b)(3).[10] Accordingly, we conclude that Plaintiffs have standing for their NEPA and ESA claims.[11]

IV

Because this case involves review of a final agency determination under the Administrative Procedure Act, 5 U.S.C. § 706, the district court limited its review to the administrative record, and resolved it on summary judgment.

---

[10] Indeed, given that the Corps concluded that requiring the Project to incur the cost of further mitigation would make it impracticably expensive, it is conceivable that significant new modifications or delay would block the Project entirely. *See generally*, Amanda Covarrubias & Catherine Saillant, *Longtime Foes of Ahmanson Project Rejoice*, Los Angeles Times (Sept. 24, 2003), http://articles.latimes.com/2003/sep/24 /local/me-ahmanson24/.

[11] SCOPE and Friends also satisfy the other organizational standing requirements. The protection of the Project area's natural resources is "germane to the organization's purpose," and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Wash. Envtl. Council*, 732 F.3d at 1139 (quoting *Laidlaw*, 528 U.S. at 181). Moreover, SCOPE and Friends satisfy prudential standing requirements, as "[i]t is well settled that the zone of interests protected by NEPA is environmental," *Nuclear Info. & Res. Serv.*, 457 F.3d at 950, and the zone-of-interests test does not apply to their claim under the ESA's citizen suit provision, *see Bennett v. Spear*, 520 U.S. 154, 164 (1997); 16 U.S.C. § 1540(g).

We review a grant of summary judgment de novo, and must determine whether the Corps's action was arbitrary or capricious under the APA.**[12]** *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004) (citing 5 U.S.C. § 706(2)(A)), *superseded on other grounds by* Definition of Destruction or Adverse Modification of Critical Habitat, 81 Fed. Reg. 7214.

"Review under the arbitrary and capricious standard is deferential . . . ." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). "[O]ur proper role is simply to ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious,'" *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008), and we require only "'a rational connection between facts found and conclusions made' by the defendant agencies." *Finley*, 774 F.3d at 617 (quoting *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014)). Accordingly, "we will not vacate an agency's decision unless [the agency] 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Nat'l Ass'n of Home Builders*, 551 U.S.

---

**[12]** Even though SCOPE brings its ESA claim under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), "the APA's 'arbitrary and capricious' standard applies; and, an agency's 'no effect' determination under the ESA must be upheld unless arbitrary and capricious." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011).

at 658 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"This approach . . . requires us to defer to an agency's determination in an area involving a 'high level of technical expertise.'"  *Lands Council*, 537 F.3d at 993 (citation omitted).  That is, "[w]e are to be 'most deferential' when the agency is 'making predictions, within its [area of] special expertise, at the frontiers of science.'"  *Id.* (alteration in original) (quoting *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003)).  We cannot "substitute our judgment for the agency's in determining which scientific data to credit, so long as the conclusion is supported by adequate and reliable data."  *Finley*, 774 F.3d at 620.

V

A

We first consider SCOPE's CWA claim.  SCOPE argues that the Corps failed to select the least environmentally damaging practicable alternative in issuing a Section 404(b) permit.  SCOPE claims that in determining the overall project purpose, the Corps incorporated Newhall Land's project objectives and the County's Specific Plan objectives and therefore relied on an overly specific purpose that unduly narrowed the range of available alternatives.

We disagree.  As explained above, the Corps not only may, but must, consider Newhall Land's project objectives, provided that those project objectives are not so narrowly defined as to preclude alternatives, s*ee Jones*, 741 F.3d at 1002; *Sylvester*, 882 F.2d at 409, and must also consider the Specific  Plan  objectives,  33  C.F.R.  §§  320.4(j)(2),

336.1(c)(11)(ii).  Therefore, the Corps was not arbitrary or capricious in rejecting certain alternatives on the ground that they failed to meet Newhall Land's objectives or the Specific Plan objectives.

The Corps could reasonably reject Alternatives 7 and 8 because their substantial reductions in the extent of developable land (44 percent and 25 percent, respectively) would prevent the Project from meeting elements of the overall project purpose and their substantial increase in costs (51 percent and 28 percent, respectively) would render them impracticable.  Nor was the Corps arbitrary or capricious in rejecting Alternative 6 on the ground that it reduced developable space in a manner that would preclude village-style development, its 13 percent increase in cost would make it impracticable, and other practicable alternatives would be less environmentally damaging.[13]

SCOPE next attacks the manner in which the Corps assessed the cost of the alternatives under consideration. First, SCOPE contends that the Corps failed to select the least environmentally damaging practicable alternative because further avoidance and minimization of impacts to waters of the United States were theoretically possible, and the Corps erred in considering the financial impact of further avoidance. We disagree.  The regulations require the Corps to take into

---

[13] SCOPE argues that the Corps should have followed its 1989 intra-agency review decision in the Hartz Mountain project in New Jersey, where the Corps acknowledged that "federal concerns over the environment, health and/or safety will often result in decisions that are inconsistent with local land use approvals."  However, the Corps's 1989 decision pertained to a different project in an entirely different context. Nothing in that decision shows that the Corps erred in its consideration of the Specific Plan objectives here.

consideration the cost of an alternative in making the determination that there is no practicable alternative. *See* 40 C.F.R. § 230.10(a)(2) ("An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."). The Corps followed this regulatory requirement in determining that it would be impracticably expensive to adopt an alternative more restrictive than the selected alternative, Modified Alternative 3, to avoid further impacts to waters of the United States. The Corps's determination was reasonably based on its findings that Modified Alternative 3 would be more expensive than any previous comparable development project in southern California, and would also exceed the average and median costs for such projects by at least 56 percent. The alternative was 5.7 percent more costly than Newhall Land's preferred alternative, and significantly shrank the Project's footprint. The Corps's decision that Modified Alternative 3 was at the outer limit of cost practicability was thus based on a "rational connection between facts found and the conclusion" made and we defer to its determination under 40 C.F.R. § 230.10(a)(2). *Butte Envtl. Council*, 620 F.3d at 947; *see also Bering Strait Citizens*, 524 F.3d at 948.

SCOPE further criticizes three different aspects of the Corps's cost methodology. It claims that: (1) the Corps should have considered costs on a per-residential unit or per-commercial floor space basis rather than a per-acre basis; (2) the Corps was required to consider the Project's revenues; and (3) the Corps should have excluded land acquisition costs because those costs are sunk costs. We disagree. The Section 404(b) Guidelines do not require the Corps to use any particular metric for analyzing costs; rather, they merely instruct the Corps to assess alternatives in light of their "cost,

existing technology, and logistics," 40 C.F.R. § 230.10(a)(2). Therefore, so long as the Corps's evaluation of costs is reasonable, we must defer to it. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 658. Here, the Corps adopted a reasonable methodology for calculating and evaluating costs, and therefore it is entitled to deference.

The Corps's evaluation of costs on a per-acre basis was reasonable. As the Corps explained, Newhall Land intended to sell developable land by the acre, rather than developing the land itself and selling units or floor space. Accordingly, the Corps could reasonably conclude that determining Newhall Land's costs per acre made more sense than speculating about the type and density of units that might ultimately be built on that land. The Corps also noted that the per-acre cost metric was "more widely used in the industry."

The Corps also reasonably declined to consider revenues as part of an alternative's costs. The regulations direct the Corps to assess practicability based on "cost, existing technology, and logistics." 40 C.F.R. § 230.10(a)(2). "Cost" means an "expenditure or outlay," *see* Webster's Third New Intl. Dictionary 515 (2002), and does not include "revenues," which are items of income, *see id.* at 1942.[14]    Although

---

[14] We additionally reject SCOPE's suggestion that the EPA has authoritatively interpreted "cost" in 40 C.F.R. § 230.10(a)(2) to include revenues. Neither of the authorities on which SCOPE relies, a 2008 comment made by the EPA in response to a Section 404 permit sought by the Potash Corporation of Saskatchewan, and the EPA's comment in response to the Draft EIS/EIR in this case, purports to be an authoritative interpretation of the Section 404(b) Guidelines. Of course, even if those documents did purport to offer an authoritative interpretation, such an interpretation could not supersede the unambiguous plain language of

revenues are not part of "costs," the Corps nevertheless stated that it took revenues into account "by looking at how each alternative affects developable acreage, which is the source of revenue for the project." Given the close relationship between the developable acreage resulting from the Project and revenues to Newhall Land, the Corps did not fail to consider an important aspect of the problem.[15]

Finally, the Corps did not err by including the acquisition costs of the property proposed for the Project site. The Section 404(b) Guidelines do not require a specified treatment of land acquisition costs, so we defer to the Corps's judgment unless its decision was arbitrary or capricious. *See Jones*, 741 F.3d at 996. Here, the Corps reasonably included the acquisition costs as part of its determination of whether an alternative is practicable. Because Newhall Land is investing (or contributing) its valuable site to the Project, the costs of the Project include the value of the property. Accordingly, the exclusion of the value of the property would have led to inaccurate comparisons between the costs for the Newhall Ranch project and the costs for comparable projects, which would require property acquisition. Indeed, the Corps would have arguably "entirely failed to consider an important aspect of the problem" had the Corps *excluded* land costs in its practicability analysis rather than included it. *Nat'l Ass'n of*

---

40 C.F.R. § 230.10(a)(2). *See Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 555 (9th Cir. 2009).

[15] SCOPE's characterization of the land cost to Newhall Land as a "sunk cost" is similarly incorrect. A sunk cost is "[a] cost that has already been incurred *and that cannot be recovered*." *See* Black's Law Dictionary 398 (9th ed. 2009) (emphasis added). Newhall Land could recover the costs of acquiring the Project site (however long ago those costs were incurred) by selling the site.

*Home Builders*, 551 U.S. at 658 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

We therefore find no merit in SCOPE's CWA challenges to the Corps's permit issuance.

B

We next turn to SCOPE's claim that the Corps violated the ESA.  SCOPE argues that the Corps erred in determining that the Project "will have no effect" on Southern California steelhead in the Santa Clara River, and so was required to consult with NMFS on the Project's potential impact.  *See Pac. Rivers Council*, 30 F.3d at 1054 n.8; 50 C.F.R. § 402.14(a).  SCOPE argues that the Project may affect steelhead because, during storm events where the volume of the Project's discharges is sufficient to flow into the reach of the Santa Clara River downstream of the Dry Gap, those discharges will contain concentrations of dissolved copper that cause sublethal impacts to juvenile steelhead smolt.

We disagree.  The data and analysis set forth in the Draft EIS/EIR and Final EIS/EIR consistently establish that concentrations of dissolved copper in discharges from the Project would be within the background range already observed in the Santa Clara River and well below the CTR's dissolved-copper criterion for the Santa Clara River.  During storm events large enough to cause discharges from the Project to flow into the reach of the Santa Clara River downstream of the Dry Gap, the background concentration of dissolved copper in the relevant portion of the Santa Clara River averages 9.9 micrograms-per-liter. The Final EIS/EIR estimated that the combined discharge from the Project's stormwater runoff and its wastewater treatment plant would

contain only 9.0 micrograms of dissolved copper per liter, which would be lower than that background concentration.[16] The 2011 Supplemental Water Quality Analysis (incorporated by reference into the ROD) found that the additional stormwater retention measures required by the Corps would reduce the dissolved-copper concentration of the Project's stormwater discharges from the 8.3 micrograms-per-liter referenced in the Final EIS, to 6.5 micrograms-per-liter, again well below background. Given this information, the Corps reasonably concluded that the Project's discharges of dissolved copper would not affect steelhead downstream of Dry Gap. The Corps also noted that because the Project discharges would flow into the Santa Clara River downstream of the Dry Gap only when water flows were already high, the Project discharges would constitute less than one percent of the River's flow and "water quality in the Santa Clara River would not be significantly affected by the discharges." Because the Corps's determination that the Project would not affect steelhead was not arbitrary or capricious, we reject SCOPE's ESA claim. *See Kraayenbrink*, 632 F.3d at 481.

SCOPE's argument to the contrary hinges on its contention that the Corps erred by failing to consider a 2007 Technical Memorandum published by NMFS, *An Overview of Sensory Effects on Juvenile Salmonids Exposed to Dissolved Copper* (the "NMFS Memorandum") which Ventura Coastkeeper submitted with its comments on the Final EIS/EIR. According to SCOPE, the NMFS

---

[16] SCOPE argues in its reply brief that the Corps erred by relying in part on *average* concentrations, but the district court rejected this argument, and SCOPE abandoned it on appeal by failing to raise it in its opening brief, *see TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*, 915 F.2d 1351, 1353 n.1 (9th Cir. 1990).

Memorandum establishes that the levels of dissolved copper in discharges from the Project will have "sublethal impacts" on steelhead smolt, which are not adequately accounted for in the CTR criteria.  SCOPE argues that the Corps failed to use "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), because it did not adequately consider the thresholds set out in the NMFS Memorandum.

We reject this argument.  As a threshold matter, we may not substitute our scientific judgment for that of the agency. "The determination of what constitutes the 'best scientific data available' belongs to the agency's 'special expertise[']" and warrants substantial deference.  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (emphasis omitted) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983)). Accordingly, "[t]he best available data requirement 'merely prohibits [the Corps] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'"  *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (third alteration in original) (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000)).   In this case, the Corps could reasonably conclude that the NMFS Memorandum does not contain the best scientific data available for the Project.  The NMFS Memorandum summarizes and analyzes laboratory studies regarding the effects of concentrations of copper on coho salmon in municipal water.  It did not consider steelhead populations or the effect of copper concentrations in natural

conditions.  Moreover, it did not consider any data specific to the Project or the Santa Clara River.[17]

Nor was it arbitrary or capricious for the Corps to consider the CTR criteria as "a useful benchmark" to assess the possible water-quality impacts of the Project's discharges. The Corps could reasonably consider the CTR criteria as one source of information, given that the EPA promulgated the CTR to establish water-quality criteria "legally applicable in the State of California for inland surface waters, enclosed bays and estuaries for all purposes and programs under the Clean Water Act."  65 Fed. Reg. at 31,682; *see also* 40 C.F.R. § 131.38.  As applied here, the CTR provides "an estimate of the highest concentration of a substance in water which does not present a significant risk to the aquatic organisms in the water and their uses," 65 Fed. Reg. at 31,689, and which California and the EPA must consider in implementing various water quality programs under the CWA, *id.* at 31,683–84.[18]  Because the effects of dissolved copper and other dissolved metals depend on water "hardness" and other factors that vary among bodies of water, the CTR provides a method for calculating a site-specific dissolved-copper criterion.  *Id.* at 31,690, 31,692; *see also* 40 C.F.R. § 131.38, gen. note 3 to table in paragraph (b)(1).  The Corps could thus

---

[17] Although SCOPE faults the Corps for not expressly rejecting the use of the NMFS Memorandum, the Corps responded to the letter attaching the Memorandum, reiterated its reasoning, and explained that it had concluded that the Project would not affect steelhead.  We can thus reasonably discern that the Corps concluded that the NMFS Memorandum was inapplicable.  *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004).

[18] SCOPE does not point to any public comment disputing the use of the CTR.

reasonably consider the CTR as part of its analysis. Moreover, because the Corps considered other sources of data, including project-specific modeling, in determining that issuance of the Section 404 Permit would have no effect on downstream steelhead, SCOPE's arguments regarding limitations in the applicability of the CTR are not material.[19]

SCOPE next argues that because the Corps published its determination that the Project would not affect steelhead in its June 2010 Final EIS/EIR, it could not rely on the Supplemental Analysis, which had been issued almost a year later in May 2011, to support its determination. We reject this argument, because the Corps did not need to rely on the Supplemental Analysis in order to reach its conclusion. The Final EIS/EIR explains the Corps's determination that the Project's stormwater and wastewater discharges would not affect steelhead because the dissolved-copper concentrations of the combined discharge would be within background ranges and lower than the average concentration during large storm events, as well as substantially below the CTR's threshold. This conclusion was not arbitrary or capricious. The Supplemental Analysis merely confirmed the Corps's initial conclusion that there would be no effect because it established that the Project's stormwater retention measures would further lower the dissolved-copper concentrations in the Project's runoff. Because the Final EIS/EIR's analysis of combined stormwater and wastewater discharges was

---

[19] Although SCOPE contends that the CTR criteria were inapplicable because "unacceptable adverse effects" as defined in the CTR do not include the kind of sublethal impacts considered in the NMFS Memorandum, the Corps could reasonably conclude that the CTR's site-specific calculations were more applicable to the steelhead population at issue in the Santa Clara River.

sufficient to support the Corps's determination that Southern California steelhead would not be affected by the Project, we also reject SCOPE's argument that the Corps erred by relying on the Supplemental Analysis, which did not include the effects of wastewater discharges.[20]

We therefore conclude that the Corps reasonably determined that the Project would have no effect on steelhead, and in the absence of a consultation request from NMFS, *see* 50 C.F.R. § 402.14(a), the Corps's decision not to consult with NMFS was not arbitrary and capricious.[21]

C

In its NEPA claim, SCOPE argues that the Corps's Final EIS/EIR provided an inadequate analysis of the cumulative impacts of the Project's dissolved-copper discharges on steelhead in the reach of the Santa Clara River downstream of

---

[20] Similarly, because the Supplemental Analysis was not necessary to support the Corps's determination that the Project would not affect the steelhead, we do not consider SCOPE's argument that the Supplemental Analysis's projections were substantively flawed.

[21] NMFS did not request formal consultation with the Corps regarding the Southern California steelhead. Rather, NMFS responded to an inquiry from the Corps regarding the status of Southern California steelhead and its critical habitats, informing the Corps "the Santa Clara River basin upstream from its confluence with Piru Creek . . . is not currently considered by NMFS to be part of the critical habitat designation" for Southern California steelhead and stating that "[f]or those projects the Corps determines will have no effect, there is no need to seek concurrence from, or consult further with, NMFS." SCOPE emphasizes that the Corps received numerous comments stating it had an obligation to consult with NMFS, but such requests made to the Corps do not trigger the Corps's obligation to consult under the ESA. *See* 50 C.F.R. § 402.14(a).

the Dry Gap.  Because SCOPE raises essentially the same arguments that it advanced under its ESA claim, they fail for largely the same reasons.

First, SCOPE again contends that the NMFS Memorandum demonstrates that the Project's dissolved-copper discharges may cause sublethal impacts to steelhead, and the Final EIS/EIR failed to consider those impacts.  As explained above, the Corps did not err in declining to rely on the NMFS Memorandum.  *See Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 897 (9th Cir. 2007) ("NEPA does not require the reviewing court to 'decide whether an [EIS] is based on the best scientific methodology available.'") (quoting *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 496 (9th Cir. 1987) (alteration in original)).  Furthermore, because the Corps reasonably determined that the Project was not likely to affect steelhead populations in the Santa Clara River, it was also not arbitrary or capricious to conclude that the Project would not result in significant cumulative water quality impacts to steelhead.  *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1448 (9th Cir. 1996) (explaining that an agency's "no effect" determination under the ESA supported its conclusion that the action would "not individually or cumulatively have a significant effect on the human environment" under NEPA) (quoting 40 C.F.R. § 1508.4).  For this reason, the Final EIS/EIR provided a sufficient discussion "to show why more study is not warranted," 40 C.F.R. § 1502.2(b), and therefore satisfied NEPA's requirements. *See Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 583 (9th Cir. 2016).

Second, SCOPE challenges the Corps's reference to the May 2011 Supplemental Analysis in its response to comments on the Final EIS/EIR.  SCOPE argues that the

Corps was required to recirculate a revised EIS/EIR containing the Supplemental Analysis or alternatively, include the full document as an appendix.  As explained above, the Supplemental Analysis merely confirmed the Corps's conclusion, but was not its basis; accordingly, it did not contain "significant new information" that would require the Corps to recirculate the EIS/EIR for further comment. *California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 794 (9th Cir. 2014); *see also* 40 C.F.R. § 1502.9(c)(1)(ii).  Moreover, contrary to SCOPE's assertions, the Corps did not violate NEPA by incorporating the Supplemental Analysis by reference and informing the public that it was available upon request, rather than providing the document in an appendix.  *See California ex rel. Imperial Cty. Air Pollution Control Dist.*, 767 F.3d at 794–95; 40 C.F.R. § 1502.21.

Because the Final EIS/EIR provided an adequate analysis of the cumulative impacts of the Project's dissolved copper discharges, SCOPE's NEPA claim also fails.

## VI

We conclude that the Corps complied with its obligations under the CWA, having properly considered practicability as required under the Section 404(b) Guidelines.  We further conclude that the Corps complied with the ESA, as its determination that Southern California steelhead would not be affected by the Project and its corresponding decision not to consult with NMFS were not arbitrary and capricious.  For similar reasons, we conclude that the Corps reasonably assessed the Project's potential impacts to the steelhead and provided sufficient discussion to satisfy its NEPA obligations.

Accordingly, the district court properly granted summary judgment in the Corps's favor.

**AFFIRMED.**